## Vanston Estate

*Robert J. Murphy*, for contestant.

*Sebastian U. Colbassani* and *J. Charles Hanahue*, for proponents.

TREMBATH, P. J. (Forty-fourth Judicial District, Specially Presiding), May 19, 1961.—This is an appeal from the action of the register of wills admitting to probate as the last will and testament of Sadie G. Vanston, deceased, a certain instrument dated April 5, 1958.

Decedent and her husband, who predeceased her, each executed a will dated October 9, 1957, by which the surviving spouse was made the beneficiary and, if the spouse did not survive, all property was left to their sons, John D. and William J. Vanston.

The amended petition for a citation attacks the execution of the 1958 instrument and also alleges that the 1958 instrument, if otherwise valid, was invalid because it was in breach of the contract with her deceased husband to make the mutual and reciprocal wills dated October 9, 1957. If there was, in fact, a valid contract to make mutual wills, and if the later will does constitute a breach of that contract, this would not prevent the probate of the later instrument, but would affect distribution only; Norris' Estate, 329 Pa. 483, 492; Way Estate, 379 Pa. 421, 429.

The parties, nonetheless, have agreed that the court at this time determine whether testatrix and her husband made a valid, irrevocable contract to make a will, enforceable at distribution of this estate. If so, the

question of due execution may become unimportant. McGinley's Estate, 257 Pa. 478, 486, is judicial precedent for such an agreement.

Since the maker of a will may ordinarily alter, modify or revoke it at any time during life, mutual wills entered into between husband and wife may be altered or revoked by the surviving spouse in the absence of any agreement to the contrary: Cawley's Estate, 136 Pa. 628.

If properly proved, a contract for the execution of mutual or reciprocal wills, which are to be irrevocable, is valid and enforceable: Swenk Estate, 176 Pa. Superior Ct. 513.

The ordinary approach to such a mutual or reciprocal will is that such a will is revocable by either or both of the makers: Cawley's Estate, 136 Pa. 628, 640.

In the case before the court, there is no dispute concerning the facts surrounding the execution of the mutual and reciprocal wills.

John Vanston, in the summer of 1957, suggested to his parents that they should make new wills. With their permission, he brought Attorney William Murphy to them for this purpose. Attorney Murphy talked with them, and upon their instruction prepared wills by which everything, after the death of the survivor of them, was left to John Vanston and his wife, Grace, and named John Vanston and his brother, Dr. William Vanston, executors. Several days after his first visit, Attorney Murphy returned with the wills he had drafted according to those instructions, and decedent and her husband each signed. Then John Vanston delivered copies of those wills to Dr. William Vanston.

Shortly thereafter, according to John Vanston, Dr. William Vanston caused two doctors to examine his parents. On this point, Dr. William Vanston's version is that the doctors did call but their visit on the same

day was coincidental. In any event, after the doctors' visit, Attorney Charles Hanahue, representing Dr. William Vanston, called Murphy and said that Dr. William Vanston would start proceedings to declare his parents incompetent if something was not done about the will that Anthony Murphy drew, hereinafter referred to as the first will.

Sadie G. Vanston and her husband were disturbed by the unpleasantness stirred by the first will and, as a result, Dr. William Vanston and his attorney, Charles Hanahue, and John Vanston and Attorney William Murphy met with Mr. and Mrs. William Vanston, Sr., at their home. The parties discussed the necessity or wisdom of new wills. The father, although satisfied with the first wills, reluctantly allowed himself to be persuaded by his wife to leave half the property (other than his insurance business) to Dr. William Vanston. Thereafter, wills were prepared to carry out the later instructions and these wills, hereafter referred to as the second wills, were signed on October 9, 1957, at which time both Dr. William Vanston and his attorney, Charles Hanahue, John Vanston and Attorney William Murphy were present and saw the execution of the wills, and the subscribing witnesses were the two lawyers. At the instance of the lawyers, Dr. William Vanston and John Vanston, between whom there had existed an enmity distressing to their parents, shook hands in the presence of their parents to the parents' evident happiness.

These facts eloquently prove a contract to make a will, which was executed by the actual signing of the wills. The agreement to make such wills was explicit and the consideration was not only the mutual promises but the settlement of an unpleasant quarrel between their two sons caused by the first wills. We believe that the contract in this case ought to be sustained as a family agreement: Way Estate, 379 Pa.

421, 436, 437. One of the basic reasons why family agreements are the favorites of the law is that they avoid litigation between members of a family. This is exactly the reason the second wills were executed.

Much of the deposition of Dr. William Vanston was an attempt to prove that the contract to make the mutual and reciprocal wills, if such there was, was not irrevocable.

On this point, no other witness testified to any conversation on this subject by the parents or by anyone else in their presence. It should be noted that Attorney William Murphy gave a completely circumstantial account of the events that took place during the preparation for, and the execution of, the mutual wills but made no mention of any conversation on this point.

Dr. Vanston's deposition on this point does not attempt to quote what anyone said to his parents or what either of them said to each other, but consists of his conclusions, "a new will would be drawn and considered as a temporary will until my parents would so desire to make one of their own liking." (Record p. 59) "There was an agreement to just the opposite, that they could and would change it at their discretion." (Record, p. 60)

"Q. And to your knowledge there was no agreement that they should be mutual or reciprocal wills that could not be changed . . .?"

"A. There was no such thought." (Record p. 61) "This was definitely a temporary drawn will." (Record p. 61) "I'll use the word 'temporary' again which was considered by all to be such." (Record p. 63)

"Q. There was no discussion whatsoever, — that neither one of those two making the wills dated October 9, 1957, could change the wills if they desired to?" (Record p. 63)

"A. There was no such thought."

And where the doctor does quote his parents, the quoted language does not indicate a right reserved to unilaterally revoke the 1957 instruments.

"A. As they both said to me then and later. We will make our own will later." (Record p. 63)

"Q. Doctor, there has been no understanding, in the presence of both counsel that were there, and all of you, that there would be any restriction on either one to make any change in those particular wills?"

"A. No." (Record p. 64)

It is most unlikely that any layman would say anything on the subject of irrevocability of these wills. If the matter was discussed at all, one of the attorneys present would most certainly have said something. The attorneys, who were present at the time, were present in court and testified to nothing in this regard. It may well be that Dr. William Vanston had such a belief, but the question is not his frame of mind but what was said.

We find the evidence proves an irrevocable contract to make a will entered into between William Vanston, Sr., and his wife. The evidence is fully as convincing as that in Gredler Estate, 361 Pa. 384, where husband and wife agreed that the survivor of them would make a will leaving the residue of the estate to be held and used by the Catholic Church. It is also as convincing as the evidence in Swenk Estate, supra, in which case the court found that the evidence established a contract to make a will between two elderly, unrelated, women who had lived together for many years.

The testimony taken on the citation and answer clearly raises an issue of due execution of the instrument dated April 15, 1958, which contestant is entitled to have heard by a jury. We find that no substantial dispute as to the testamentary capacity of decedent is raised and that contestant is not entitled that such issue be submitted to a jury.

And now, May 19, 1961, an appeal having been taken from the decree of the register of wills admitting to probate a certain writing dated May 5, 1958, as the last will and testament of Sadie G. Vanston, an issue is framed between John Vanston, the contestant, as plaintiff, and Irene Vanston, Gerald E. Vanston, Jr., Maurita Vanston, William J. Vanston, Christine Vanston, Robert A. Vanston, Vivian Vanston, Mrs. Thomas J. Collins as defendants, to try by a jury the following question of fact:

Was the instrument dated May 5, 1958, duly executed by Sadie G. Vanston in the manner required by law?

Pursuant to stipulation of counsel that there should be a present determination on the basis of testimony already taken whether William J. Vanston, Sr., and Sadie G. Vanston, his wife, entered into an irrevocable contract to make the wills dated October 9, 1957, we find that William J. Vanston, Sr., and Sadie G. Vanston shortly prior to October 9, 1957, entered into an oral contract to make mutual or reciprocal and irrevocable wills, and that the wills dated October 9, 1957, carried that contract into effect. We further find that distribution of this estate, when made, will be controlled by that contract.